IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2015

**STATE OF TENNESSEE v. CASEY DEWAYNE MOON**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-467     Cheryl Blackburn, Judge**

---

**No. M2014-00886-CCA-R3-CD – Filed April 28, 2015**

---

A Davidson County jury convicted appellant, Casey Dewayne Moon, of aggravated burglary, a Class C felony, and theft of property valued under $500, a Class A misdemeanor.  The trial court sentenced him to four years for the aggravated burglary conviction and a concurrent sentence of eleven months, twenty-nine days for the misdemeanor theft conviction.  The trial court ordered him to serve the first six months in confinement with the remainder to be supervised in community corrections.  On appeal, appellant argues that the trial court erred by allowing the State to introduce evidence of a prior theft conviction; that the evidence was insufficient to support his convictions; and that the trial court erred in its sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Dawn Deaner, District Public Defender; and Emma Rae Tennant (on appeal), Kristin Neff (at trial), and Patrick Hakes (at trial), Assistant District Public Defenders, Nashville, Tennessee, for the appellant, Casey Dewayne Moon.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Bret Thomas Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
I.  Facts

On August 25, 2012, the sons and husband of Robin Hull, who had died in the summer of 2012, were cleaning out her apartment in the Wedgewood Towers building.

After taking a break, the Hull brothers returned to their mother's apartment to find a man with a cart of items taken from Mrs. Hull's apartment waiting on an elevator. They confronted the man, and he returned the items to the apartment. One of the brothers identified appellant in a photographic lineup as the man they had observed, and the Davidson County grand jury subsequently indicted appellant for aggravated burglary and theft of property valued at more than $500 but less than $1000.

At appellant's trial, Cameron Russell Hull, the son of Robin Hull, testified that on August 25, 2012, he, his brother, and his father were cleaning out Mrs. Hull's apartment. They placed some items in the hallway for other residents to claim if they wanted the items. They took a break to eat, and when Cameron[1] and his brother returned, they saw a man wearing a blue shirt with a shopping cart waiting for an elevator. He said that he had never seen the man before that exact moment. Cameron testified that his mother's television, steamer, and suitcase were in the shopping cart. From the witness stand, he identified appellant as the man he saw with the shopping cart and his mother's possessions. Cameron said that his brother confronted appellant, who responded that he had been directed to take Mrs. Hull's electronics to the second floor. When asked whether appellant told the brothers that he worked for the apartment or for maintenance, Cameron replied, "I believe in that capacity he did." Cameron said that when his brother told appellant that they had until Monday to clean out Mrs. Hull's apartment, appellant took the shopping cart back to Mrs. Hull's door and opened the door with a key that was on a wooden dowel. Cameron testified that he was positive that they had locked the door before they left for lunch. After appellant left, Cameron and his brother first called their father and then, on their father's instruction, called 9-1-1. Cameron testified that the television was worth at least $400 and that the steamer was worth between $20 and $40. He said that the suitcase had a set of flatware inside and that he did not know the value of the suitcase or the flatware. Cameron further testified that an HDMI cable worth $20 and a DVD player worth at least $50 were also in the cart, as well as bars of soap, two bags of potato chips, and a knife set. He estimated that the knife set was worth $20. Cameron recalled that the television had been on its stand inside the apartment when they left for lunch and that the knives had been packed inside a box. He said that a second television had been moved from its customary location to the floor. Cameron testified that he was the executor of his mother's estate and that he had not given anyone permission to enter the apartment. He said that he met with the police ten to fourteen days after August 25 to look at a photograph array. He testified that he identified appellant from the array as the person whom he saw with his mother's property.

Scott Forrest Hull II testified that on August 25, 2012, he was helping his brother and father clean out his mother's apartment. He said that when he and his brother

---

[1] Because two witnesses bear the same surname, we will refer to them by their first names for the sake of clarity. We mean no disrespect by this practice.

returned from lunch, they saw a man at the elevator on their mother's floor. He had a shopping cart with items they recognized from their mother's apartment, including a forty-two-inch television. Scott asked the man where he had gotten the television, and the man replied that he was "moving stuff out of the apartment." Scott said that he specified that it was "Robin Hull's apartment." Scott testified that the man identified himself as a maintenance worker and claimed that "he was tasked by the property to move stuff out of Robin Hull's apartment." He did not give the Hull brothers the name of the person who had given him this task. Scott testified that the man was wearing a navy blue shirt and khakis. He believed that the shirt said "First Properties." Scott said that the man opened the door to Mrs. Hull's apartment with a key that "was on a rod of some sort." The man pushed the cart through the apartment door, and Scott told him not to come back because they did not need any help. Scott testified that they called the police five to ten minutes after the man left. He further testified that because he lived out of town, he had not had the opportunity to see a photograph array nor had he been able to attend appellant's preliminary hearing. Scott agreed that he had an opportunity to see appellant earlier in the trial process and while he was on the witness stand. He testified that appellant was "the person [he] saw from the elevator." Scott said that he had not seen appellant on any prior visits to his mother's apartment nor in the building on August 25. Scott testified that the flatware that appellant had taken was worth $100 to $200 and that the Blu-ray player was worth $100. He further testified that while he could not recall whether the person with the cart said anything about changing the locks on Ms. Hull's apartment, he had sent an e-mail on August 28 about the events of August 25, and in that e-mail, he had written that "the suspect does mention that he did change the locks on Robin Hull's room, Room 402, and pushes the cart inside after opening the door with a key."

John Reynolds, a dispatcher for the Metro Emergency Communications Center, testified that the center's records showed that Cameron Hull called 9-1-1 at 5:44 p.m. on August 25, 2012.

Trish Greer testified that she was the district manager for First Cumberland Properties in Middle Tennessee. She oversaw twenty-three to twenty-eight apartment complexes at any given time, one of which was Wedgewood Towers, a Section Eight high-rise with 120 units where Mrs. Hull lived. Ms. Greer said that when a tenant passed away, if the tenant was the only leaseholder, then the landlord had to change the locks on the apartment immediately. When the probate court appointed someone to have access to the apartment, the landlord would give that person keys. No one from the management company would be allowed access to the apartment except for emergencies. Ms. Greer testified that the families of tenants typically had fourteen days to remove property from a deceased tenant's apartment. Ms. Greer testified that Paula Evans was the property manager at Wedgewood Towers. Regarding maintenance of the building, Ms. Greer testified that a corporate-level maintenance crew led by Ernest Harrell was responsible

-3-

for maintenance of Wedgewood Towers on August 25, 2012. She said that appellant worked for Mr. Harrell. Ms. Greer said that she communicated with neither Mr. Harrell or appellant about a maintenance issue at Wedgewood Towers on August 25. After the incident, she requested and received a written statement from appellant on August 28, which she read to the jury:

> I received a call from Paula on Saturday, August 25th, for an AC call for Apartment 811 at 3:00 p.m. I left and went to Wedgewood, arrived at around 3:45 p.m., parked on [the] third floor next to the dumpster. When I got out of my truck, I noticed Eddie for Unit 814 going through the dumpster. I asked Eddie what he was doing. He said he was getting stuff out that was being thrown away from Ms. Robin's apartment. I told him he could not be going through the dumpster. He told me that everyone else had been getting stuff out. I went in on the third floor, went up to the unit, 811, found the unit had a grounded compressor, called Paula and Ernie to see if there was a vacant available to swap out a unit with if they didn't have one. This was at 4:25 p.m. Went down to the second floor, got an AC unit and the AC cart, went to 811. As I was going up in the elevator, the son of Robin Hull got on the elevator with me. I went to 811, swapped out the AC unit, left 811, went to the second floor, returned the AC unit and the AC cart, exited out of the second floor door and placed keys back under a rock outside of the second floor door, went around the building to my truck still parked next to the dumpster, and left at around 5:00 p.m. Went home and took a shower and was called at 6:20 by Paula while me and my girlfriend were out at supper.

Paula Evans, the property manager for Wedgewood Towers, testified that she received a call on August 25 from Apartment 811 that the tenant's air conditioner was not working. She called appellant about the problem because Mr. Harrell was on vacation out of town. Ms. Evans recalled that appellant asked her to call Mr. Harrell anyway, which she did. Later that day, at 5:55 p.m., she received a message from Scott Hull, Sr. Because of that message, she called appellant. She first asked appellant whether he had taken care of the maintenance issue in Apartment 811 and then asked whether appellant had been wearing khakis and "a blue shirt with white writing of FCP property on it." Appellant responded that he had worked on Apartment 811's air conditioner and that he had been wearing khaki shorts and a shirt with the property company's name on it. He did not tell her what color shirt he had been wearing. Ms. Evans testified that no one else who did maintenance work at Wedgewood Towers was of the same age, race, and build as appellant.

On cross-examination, Ms. Evans acknowledged that appellant answered her telephone call and did not seem nervous while he answered her questions. She testified

that at the time of the incident in question, there were two skeleton or master keys for the building, one of which she had. The second master key was on a copper dowel that was hidden outside for the maintenance staff to use. Ms. Evans agreed that her telephone number for work was xxx-1540.

On re-direct examination, Ms. Evans testified that appellant performed the mandatory replacement of the lock on Ms. Hull's apartment. On recross-examination, she said that she asked appellant to change the locks the day she was notified that Ms. Hull had passed away. Ms. Evans testified that there was not a work order for changing the locks.

Ernest Harrell testified that on August 25, 2012, he was out of town but was still taking maintenance calls for First Cumberland Properties, with the plan to dispatch appellant to do repairs as necessary. He said that he received a call from Ms. Evans that day about an air conditioner at Wedgewood Towers. He called appellant to take care of the problem.

On cross-examination, Mr. Harrell testified that he remembered appellant's telling him that Ms. Evans had called appellant to ask whether he had been in an apartment because "somebody took something out of an apartment." Mr. Harrell agreed that he and appellant were friends. He said that he "might have" gone to Wedgewood Towers to retrieve the hidden key after this incident. Mr. Harrell testified that appellant continued to work for him for approximately two weeks after the incident, until management ordered that he be fired. Mr. Harrell agreed that his telephone number was xxx-5813.

Metro Nashville Police Detective Michael Butler testified that he prepared a photograph array that included appellant's picture and that he showed the array to Cameron Hull on September 4, 2012. Appellant's photograph was in position number four in the array. Detective Butler testified that Cameron "immediately went to number four, circled it, initialled it, and said that was the person he saw with a buggy that contained his mother's property." Detective Butler said that he would have also shown the array to Scott if Scott had not lived out of town.

Tennessee Bureau of Investigation Special Agent Michael Frizzell testified as an expert in the use of cellular telephone records in law enforcement investigations. He said that he had analyzed records for the number xxx-6927, which the parties had agreed belonged to appellant, for the time period of August 24 to August 26, 2012. Focusing on the time period of 3:25 p.m. to 6:25 p.m. on August 25, Agent Frizzell testified that appellant's cellular telephone made data connections to the network at 4:14, 5:14, and 6:14. In each of these connections, the telephone connected to two cellular towers. At 4:14 and 5:14, the telephone connected to the same two towers both times. At 6:14, the telephone connected to one of the same towers as the previous times but also to a new

tower. Agent Frizzell testified that this change indicated that the telephone had moved to a different location. He said that his analysis also took into account the voice conversations between 4:14 and 5:14 that were using a cellular tower close to Wedgewood Towers. He further testified that a 6:07 p.m. text that connected to a tower 9.1 miles away from Wedgewood Towers also showed that the telephone had changed locations.

The State rested its case-in-chief following Agent Frizzell's testimony. Subsequently, appellant called John Terry, an investigator with the District Public Defender's office, to testify on his behalf. Mr. Terry testified that according to the telephone records, at 3:53 p.m. on August 25, telephone number xxx-6927 (previously identified as appellant's number) sent a text message to xxx-5813 (previously identified as Mr. Harrell's number). At 4:22 p.m., xxx-6927 (appellant) called xxx-5813 (Mr. Harrell). At 4:25 p.m., xxx-6927 called xxx-5813 (Mr. Harrell) and xxx-1540 (previously identified as Ms. Evans' number). At 4:26 p.m., xxx-6927 (appellant) called xxx-1540 (Ms. Evans). At 4:41 p.m., xxx-5813 (Mr. Harrell) called xxx-6927 (appellant). At 6:07 p.m., xxx-5813 (Mr. Harrell) sent a text message to xxx-6927 (appellant). At 6:10 p.m., xxx-6927 (appellant) sent a text message to xxx-5813 (Mr. Harrell). At 6:19 p.m., xxx-1540 (Ms. Evans) called xxx-6927 (appellant). At 6:25, xxx-6927 (appellant) called xxx-5813 (Mr. Harrell).

Appellant testified on his own behalf and said that he had worked for First Cumberland Property for two to two and a half years prior to the incident in question. He agreed that in 2011, he had received a citation for misdemeanor theft and had pleaded guilty. Appellant testified that he and his supervisor, Mr. Harrell, kept the master key to Wedgewood Towers on a two-foot long copper rod that they kept hidden outside the building so that either of them could access it as needed. Appellant said that on August 25, a Saturday, Paula Evans called him around 1:30 p.m. He arrived at the property at approximately 4:00 p.m. He said that he first went to the eighth floor using the elevator, then went to the maintenance shop on the second floor. He put an AC unit on a cart, returned to the eighth floor, swapped out the AC units, and returned to the second floor. Appellant stated that while he was at the property, he called his supervisor both before and after completing the task and also called the property manager. Appellant testified that when he first arrived at the property, he saw a resident going through the dumpster. He further testified that he saw the Hull brothers on the elevator. He said that he did not know the Hull brothers' first names but recognized them from having seen them at the property before that day. Appellant stated that he had not had any previous interaction with them. Appellant testified that he did not go into Robin Hull's apartment on August 25 nor did he remove anything from her apartment. He said that when he left the property, he went home, showered, and went to a restaurant with his girlfriend. Appellant stated that Paula Evans called him at 6:10 or 6:15 p.m. and asked him whether he had fixed the AC unit and whether he remembered what shirt he had been wearing. He said

that he had to ask his girlfriend about the color of the shirt that he had worn to work. Appellant testified that Ms. Evans also asked him whether he had been in Robin Hull's apartment or on the fourth floor and that he told her he had not. Appellant said that four days later, he was asked to submit a written statement about his activities on August 25 and that two or three weeks later, he was suspended from work. Appellant testified that the maintenance crew always had either paper work orders or had to document work orders through e-mail. He said that he could not recall being asked to change the locks on Robin Hull's apartment and that if he had been asked, then there would have been a work order.

On cross-examination, appellant testified that he would not have changed the locks on an apartment without a work order. He agreed that his recollection of events would have been "fresh" on August 28, the day that he submitted a written statement. He further agreed that his statement said that he arrived at the property at 3:45 p.m. Appellant acknowledged that the resident who had been going through the dumpster told him that some of Robin Hull's possessions had been thrown away. Appellant said that he made a mistake in his statement when he wrote "the son of Robin Hull" rather than "sons." He said that the cart on which he had transported the air conditioning unit was three feet by four feet and agreed that he, the cart, and both Hull brothers were in an elevator together. Appellant testified that he left Wedgewood Towers at 5:00 p.m. and had not seen any other First Cumberland Properties employees while he had been there.

Marcie Davis testified that she was appellant's fiancée and that on August 25, 2012, she and appellant had lived in a house in Antioch, Tennessee. She said that she remembered appellant's receiving a call to do an air conditioning repair job that day. She recalled that when he returned, he took a shower before they went to eat at a restaurant nearby. While they were at the restaurant, appellant received a telephone call from Paula Evans. Ms. Davis testified that appellant's demeanor had been "normal" before the telephone call but that after the call, he was "a little upset."

Following the close of proof and deliberations, the jury convicted appellant of aggravated burglary, a Class C felony, and the lesser-included offense of theft of property valued at less than $500, a Class A misdemeanor.

Subsequently, the trial court held a sentencing hearing. The State submitted appellant's presentence report, an addendum to the presentence report, and his negative drug screen results as exhibits. The State also called David Shearon to testify. Mr. Shearon testified that he had known appellant for approximately twelve years and that he had hired him to be an apartment manager for one of his properties after appellant was fired from First Cumberland Properties. Mr. Shearon explained that he had believed appellant when appellant claimed he was innocent. However, Mr. Shearon later terminated appellant because (1) appellant refused to participate in an inspection of the

property; (2) a tenant who was behind on his rent told Mr. Shearon that he had paid the rent in cash to appellant and had receipts signed by appellant as proof; and (3) Mr. Shearon found a person living in the building for whom he had no records, and the person reported that he had paid appellant some money. Mr. Shearon testified that appellant claimed he had provided receipts for the tenant to help the tenant find another apartment and that the situation with the person living in the building without paperwork had yet to be resolved satisfactorily. Mr. Shearon said that before these issues arose, he had told appellant that he would be a character witness for him but that appellant had refused his help in that regard. Mr. Shearon stated that he felt betrayed by appellant.

The trial court found that appellant had a history of criminal conduct in addition to that necessary to set his range and, based on the fact that appellant was on probation for misdemeanor theft when he committed the instant offense, that appellant committed the offense while on probation. *See* Tenn. Code Ann. § 40-35-114(1), (13)(A). The trial court further found as a mitigating factor that appellant's conduct did not cause or threaten serious bodily injury. *Id.* § 40-35-113(1). The trial court then set appellant's sentence at four years for the aggravated burglary conviction and eleven months, twenty-nine days for the theft conviction. The trial court determined that some incarceration was appropriate in this case and ordered that appellant serve six months of his sentence in confinement with the remaining time supervised by community corrections.

Appellant filed a timely motion for new trial, which the trial court denied after a hearing. Thereafter, he properly filed a notice of appeal.

## II. Analysis

### A. Rule 609

Appellant argues that the trial court erred by allowing the State to impeach his credibility by admitting evidence of his prior theft conviction, which was substantially similar to the offense for which he was being tried. The State responds that the trial court followed the appropriate procedure and analysis and therefore did not abuse its discretion in admitting evidence of the prior theft conviction.

We review a trial court's ruling on the admissibility of prior convictions for impeachment purposes for abuse of discretion. *State v. Lankford*, 298 S.W.3d 176, 180 (Tenn. Crim. App. 2008); *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). Rule 609 of the Tennessee Rules of Evidence governs the use of prior convictions for impeachment evidence. The rule states, in part:

> (a)(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of

the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

As applicable in this case, Rule 609 permits, under certain conditions, introduction of an accused's misdemeanor conviction for impeachment purposes if the offense involved dishonesty. Tenn. R. Evid. 609(a)(2). The trial court must make a determination of whether the probative value of prior conviction outweighs its prejudicial effect. *Id.* 609(a)(3). In doing so, the court "should assess the similarity between the crime on trial and the crime underlying the impeaching conviction. As a general rule, 'the unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried.'" N. Cohen, S. Sheppeard, & D. Paine, Tennessee Law of Evidence § 609.10(c) (6th ed. 2011). Our supreme court has stated that

> when an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged. Accordingly, the unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried. Therefore, trial courts should carefully balance the probative value of the impeaching conviction on credibility against its unfairly prejudicial effect on substantive issues.

*State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999) (internal citations omitted).

In this case, the State properly notified appellant of its intent to use his 2011 misdemeanor theft conviction as impeachment evidence in this case. The trial court held a hearing on the matter prior to trial, and both parties presented brief arguments. Appellant contended that the prior theft conviction should not be introduced because he was being tried for theft. The State responded that the prior conviction should be admitted because of its high probative value regarding credibility. The trial court ruled as follows:

Well, 609 is clear about the procedure that needs to be followed about impeachment of evidence, conviction of the crime. That is, before trial hold a jury-out hearing, which is what we're doing right now, and then I have to determine whether the probative value on credibility outweighs its unfair prejudicial effect on substantive issues. Looking at the conviction, it is a theft. It is clearly within the ten[-]year time frame. It's in 2011. And it is the most probative on the issue of credibility of any crime that you can have. That is, it's a crime of dishonesty. He is charged with a theft. He's also charged with aggravated burglary but with theft. That's pretty - - well, if Mr. Moon is going to testify, his credibility is going to be very much at issue. So I'm going to allow the State to do that should he testify just because it's so probative of the issue of credibility. A different crime maybe not so much, but that one is. So that would be my ruling on that.

While the trial court was not as explicit in its ruling as it could have been, the court's ruling nonetheless substantially followed the procedural requirements of Rule 609 and the applicable case law. There was no need to further analyze the substantial similarity between the prior conviction and the instant offense of theft because they were the same, and the trial court's comment that the aggravated burglary was based on theft sufficed to show that the court considered it similar to theft. Furthermore, the trial court's emphasizing that theft "is the most probative on the issue of credibility of any crime" and that appellant's credibility would "be very much at issue" if he testified, coupled with its acknowledgement that it must balance the probative value against the unfair prejudicial effect, was in effect a determination that the probative value outweighed the unfair prejudicial effect. Thus, the trial court's ruling is entitled to deference. *Lankford*, 298 S.W.3d at 182.

Moreover, the trial court did not abuse its discretion in its ruling. This court has previously held that the offense of theft is a crime involving dishonesty and is therefore highly probative of credibility. *Id.* at 181 n.1 (citing *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997)). In addition, "[t]he fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). Because appellant provided an entirely different version of events than other witnesses in this case, his credibility was a central issue, but it was not the only issue. The trial court also gave a limiting instruction to the jury that they were only to consider the prior conviction for purposes of assessing appellant's credibility. Therefore, we conclude that appellant is without relief as to this issue.

B. Sufficiency of the Evidence

Appellant next argues that the evidence was insufficient to support his convictions for aggravated burglary and misdemeanor theft of property. He contends that the State did not prove his identity as the perpetrator. The State responds that not only did two witnesses identify appellant as the perpetrator but other evidence existed to show by process of elimination that appellant was the perpetrator. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); see Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for aggravated burglary, the State must prove beyond a reasonable doubt that appellant committed the burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). "A person commits burglary who, without the effective consent of the

property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault." *Id.* § 39-14-402(a)(1). Burglary can be proven through direct or circumstantial evidence. *See State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Aggravated burglary is a Class C felony. Tenn. Code Ann. § 39-14-403(b).

To support a conviction for theft of property, the State must prove that appellant, "with intent to deprive the owner of property, . . . knowingly obtain[ed] or exercise[ed] control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft of property valued at $500 or less is a Class A misdemeanor. *Id.* § 39-14-105(a)(1).

Identity is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). The State may prove identity through direct or circumstantial evidence. *Id.* It is well-established that the issue of the perpetrator's identity is a question of fact for the jury. *See State v. Vaughn*, 29 S.W.2d 33, 40 (Tenn. Crim. App. 1998); *State v. Phillips*, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986).

Viewed in the light most favorable to the State, the evidence presented at trial showed that the perpetrator entered the locked apartment of the deceased Robin Hull and placed several of her possessions in a cart that he then wheeled to the elevator. Both Cameron Hull and Scott Hull II identified appellant as the person who had a cart-load of their mother's possessions. As this court has previously stated, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). In this case, Cameron Hull identified appellant in a photograph array after the incident and again at trial. Scott Hull II also identified appellant at trial. The Hull brothers testified about the value of the property. Cameron Hull, as the executor of Robin Hull's estate, testified that appellant did not have his permission to be in the apartment. The perpetrator seen by the Hull brothers was wearing a shirt that identified him as an employee of the apartment management company, and the perpetrator also told the brothers that he was a maintenance employee. According to the witnesses, no other maintenance employee fit appellant's description. Furthermore, appellant was at Wedgewood Towers on the day in question. Appellant testified to this fact himself, and his cellular telephone records confirmed that he was in the area. Appellant had access to the apartment considering he had a master key, and the perpetrator also had a key to the apartment. Despite appellant's contention that he had left the apartment complex around 5:00 p.m. and thus could not have been the perpetrator, his cellular telephone records suggest that he could have left at a later time because the first indication that he had left Wedgewood Towers was at 6:07 p.m., when he sent a text message that was routed through cellular towers farther away from the apartment building. Appellant, identified as the perpetrator by both Scott Hull

and Cameron Hull, entered Robin Hull's apartment without the consent of the executor of Mrs. Hull's estate and obtained her property without consent. Thus, the evidence was sufficient for the jury to find appellant guilty of aggravated burglary and theft of property valued at less than $500.

## C. Sentencing

Appellant argues that the trial court erred by imposing a sentence involving partial confinement. He states that the trial court improperly considered Mr. Shearon's testimony regarding appellant's possible misconduct toward him and that partial incarceration was not the least severe measure necessary to achieve the purposes of sentencing. The State responds that the evidence supported a period of confinement and that the trial court did not abuse its discretion.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

In this case, appellant contends that the trial court should have sentenced him to a sentence fully suspended to probation or entirely served in community corrections. The defendant bears "the burden of establishing suitability for probation." Tenn. Code Ann. § 40-35-303(b). This burden includes demonstrating that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

> In determining whether to grant or deny full probation, additional considerations include the defendant's criminal record; social history and present condition of the defendant, including his or her mental and physical conditions where appropriate; defendant's amenability to correction and general attitude, including behavior since arrest, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility, and the best interests of both the defendant and the public.

*State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. Crim. App. 2001). Regarding community corrections, an eligible defendant "is not necessarily entitled to be sentenced under the Act as a matter of law or right." *State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citation omitted). A trial court should base its decision regarding any sentence involving confinement on the following considerations:

> (A)    Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B)    Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C)    Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*Id.* § 40-35-103(1).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, the trial court sentenced appellant to four years for the aggravated burglary conviction, which was within the applicable three- to six-year range, and to a concurrent sentence of eleven months, twenty-nine days for the misdemeanor theft conviction. The trial court found that appellant had committed the instant offenses while on probation and that he had taken money from Mr. Shearon while on bond awaiting the sentencing hearing. Appellant contends that the trial court should not have considered

Mr. Shearon's testimony; however, a defendant's "behavior since arrest" is a proper consideration when the trial court is determining whether to grant full probation. *Blackhurst*, 70 S.W.3d at 97. The trial court determined that appellant had not met his burden of establishing suitability for full probation and therefore ordered that appellant serve six months of his sentence in confinement with the remainder to be served in community corrections. The trial court was within its discretion to order a sentence of partial confinement because measures less restrictive than confinement had recently been applied unsuccessfully to appellant. *See* Tenn. Code Ann. § 40-35-103(1)(C). Therefore, appellant's argument is without merit.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE